HOLOHAN, Chief Justice.
This petition for special action contests the validity of certain orders issued by the respondent judge in the criminal trial of State v. Hooper and Bracy, Maricopa County Superior Court No. CR-121686.[1] We have jurisdiction under Arizona Constitution Article 6 § 5.
Specifically, petitioners requested vacation of two orders made by the respondent judge that affected the media. First, petitioners challenge the order which required courtroom sketches of the jury drawn for television broadcast to be submitted to the respondent judge before being released for broadcast (sketch order). Second, petitioners challenge the order which prohibited counsel, court personnel, jurors or other trial participants from contacting the media during the course of the trial (media liaison order). Petitioners maintain that both orders are unlawful prior restraints of media communications and cannot withstand the scrutiny given such orders under the First Amendment to the United States Constitution. The respondent judge asserts that both orders were necessary and proper to guarantee the rights of the accuseds to a fair trial.
This case presents another of those difficult situations where the often competing interests of free press and fair trial strain against each other. To understand the problems presented to the trial judge it is necessary to review the factual background leading up to the orders. Additional facts peculiar to each order will be included in the discussion of that order.
*249 FACTS
Kenneth Montoya, a reporter for KPNX, a Phoenix television station, and Jack Crow, a courtroom sketch artist (petitioners) were assigned to cover the criminal trial of Murray Hooper and William Bracy, which was being conducted before the respondent judge. Hooper and Bracy were charged with the murder of William Patrick Redmond and Helen Phelps. The case was the third in a series of prosecutions arising out of those murders.[2] The Redmond murder achieved notoriety and received extensive media coverage because of its overtones of organized crime and contract killing.
After completion of jury selection, both prosecution and defense counsel requested the respondent judge to limit contact between trial participants and the media. The respondent judge entered such an order. The original order, dated November 4, 1982 was later modified by an amended order dated December 6,1982. The amended order changed the direction of the November 4th order from the media to the attorneys, court personnel, jurors, or other participants. The operative language of the first order, “no attorneys, court personnel, jurors or other participants in this matter are to be contacted by the media during the course of this matter” became “no attorneys, court personnel, jurors or other participants in this matter are to be in contact with the media during the course of this matter.” (emphasis added). Petitioners’ challenge addresses the amended order of December 6. The amended order appointed as “court media liaison” a member of the Maricopa County Court Administrator’s staff to handle media inquiries “so that there will be a unified and singular source for the media concerning these proceedings.” The amended order concluded: “no other source of information will come from participants in these proceedings.”
Reacting to sketching of the jury on November 30, 1982, the respondent judge issued an oral order through his “court media liaison” that any courtroom sketches of the jury must be reviewed by the court before presentation on television. The trial judge believed the order was necessary to allay jurors’ fears. In findings dated December 20, 1982, he pointed to “concern at the possibility of retribution and fear for personal and family safety expressed by some of the venire members.” Respondent issued the order based on his interpretation of this Court’s order suspending Rule 45, Canon 3A(7), 17A A.R.S. Rules of the Supreme Court which barred cameras from the courtroom. Except for the two challenged orders, the trial remained open to the general public and the media.
The first challenge to the orders was brought by a group called “The First Amendment Coalition.” On December 6, 1982, the group, along with petitioner Montoya, filed a petition for special action asking this court to stay or vacate both orders.[3] We declined jurisdiction and dismissed the petition on December 8, 1982, because (1) First Amendment Coalition had not shown standing to bring the special action, (2) petitioners failed to join the real parties in interest, and (3) petitioners failed to exhaust their remedies in the trial court before seeking relief by special action. The standing of petitioners in the instant action has not been challenged.
The next media action was the present petition for special action, and its companion case, Brice v. Superior Court of Arizona, 139 Ariz. 260, 678 P.2d 445 (1984). After successfully moving to intervene in the trial court, KPNX requested the respondent judge to vacate the orders. He refused. This petition followed on Decem *250 ber 13, 1982.[4] Both orders remained in force for the duration of the underlying trial, which concluded with a guilty verdict on December 24, 1982.
MOOTNESS
The first issue which must be resolved is whether the validity of these orders became moot when the trial was completed, and the order prohibiting contact with the media was vacated on January 12, 1983. It is firmly established that “jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one ‘capable of repetition, yet evading review.’ ” Nebraska Press Ass’n. v. Stuart, 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976), quoting Southern Pacific Terminal Co. v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). We believe it reasonable to conclude that KPNX will be faced with similar orders in the future, and that such orders would “evade review” because criminal trials are “typically of short duration.” See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); Gannett Co. v. DePasquale, 443 U.S. 368, 377-378, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); United States v. Brooklier, 685 F.2d 1162, 1165 (9th Cir. 1982); Sacramento Bee v. United States District Court, 656 F.2d 477, 480 (9th Cir. 1981), cert. denied, 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982). Indeed, the petitioners have furnished us with an example of an order barring sketching during jury selection entered in another case tried in Maricopa County subsequent to the Hooper and Bracy cases. See petitioners’ Motion for Leave to File Supplemental Memorandum and to Supplement the Record. We conclude that the case is not moot.
SKETCH ORDER
Petitioners forcefully assert that the oral order requiring television sketch artists to submit jury sketches for the trial court’s review constitutes an unlawful prior restraint of expressions protected by the First Amendment. Petitioners also maintain that the sketch order violates the Equal Protection Clause of the Fourteenth Amendment because it restrains publication by the television media but not by the print media. We invalidate the sketch order on First Amendment grounds, and do not reach the latter argument.
The respondent judge defends the validity of the sketch order as based on this court’s “Order Temporarily Suspending Rule 45, Canon 3(A)(7), Rules of the Supreme Court,” and Maricopa County Superior Court “Guidelines for the Media,” 10(c). This court’s order, filed December 23, 1981, which included certain guidelines, suspended from March 1, 1982 until March 1, 1983 part of Rule 45 to allow for electronic and still photographic coverage of public proceedings in all courts of the State of Arizona on an experimental basis.[5]
One of the guidelines in the December 23 order was Guideline 10 which prohibited “coverage of jurors in a manner that will permit individual recognition by the public____” Similarly, the Maricopa County Superior Court Guideline 10(c) prohibited photographing jurors. Respondent interpreted these guidelines as prohibiting television broadcast of “specific likenesses of *251 jury members” whether captured on tape, film, or sketch pad. The respondent judge felt that “sketches ... were to be used in lieu of actual electronic television recordation of the jurors____”
Respondent limited the sketch order’s application to sketches made for television broadcast. Apparently, respondent felt that sketching for television broadcast amounted to television camera coverage of jurors which was forbidden by this court’s order and guidelines. Although the trial judge was probably accurate in characterizing the media’s attempt to circumvent our guideline, our conclusion that respondent misinterpreted both this court’s guidelines and those of the Superior Court remains unchanged. Our Guideline 8[6] and the Superior Court’s Guideline A[7] clearly excepted from coverage media representatives not using cameras or electronic equipment. Our Guideline 10 prohibited coverage that permitted individual recognition of jurors, but did not concern sketching. We recognize that sketch artists occasionally create startling likenesses. Nonetheless, pens and pads remain beyond the reach of our camera guidelines.[8]
Although we agree with the legal position of petitioners, we understand the motivation of the trial judge in issuing the sketch order. It is undisputed that the respondent judge sought to protect the jury from public identification. He believed that the jurors were concerned about possible retribution by those affected by their verdict. By reducing the jury’s concerns, the respondent judge believed that he increased the likelihood that the criminal defendants would receive a “trial by an impartial jury free from outside influences.” Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). However unconstitutional the result, the concerns were reasonable.
However, beginning with Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 1357, 75 L.Ed. 1357 (1931), the United States Supreme Court has subjected any order prohibiting the publication or broadcast of certain information to a “ ‘heavy presumption’ against its constitutional validity.” Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971). The Court explained the heavy burden on the government by stating:
A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication “chills” speech, prior restraint “freezes” it at least for the time. Nebraska Press Ass’n. v. Stuart, supra, 427 U.S. at 559, 96 S.Ct. at 2803, 49 L.Ed.2d 683 (1976) (footnote omitted).
The Stuart opinion concluded that “the protection against prior restraint should have particular force as applied to reporting of criminal proceedings.... ” Id. After Stuart, the validity of the sketch order depends on the (1) gravity of harm posed by media coverage; (2) whether other measures short of a prior restraint would have adequately protected the fair-trial right; and (3) how effectively the sketch order avoided the threat to a fair trial. Id. at 562, 96 S.Ct. at 2804.
First, what was the gravity of the harm posed by media coverage in the absence of the sketch order? The evil that concerned respondent was “the possibility *252 of retribution and fear for personal and family safety expressed by some of the venire members” when informed of the nature of the prosecution. In the absence of a specific finding, we can only assume that respondent felt that the jury’s verdict would be based on fear rather than evidence adduced at trial. But the record indicates that out of the approximately 150 member pool from which the panel was selected, the number expressing fear equalled “several.” Moreover, the record indicates that all of the “several” people expressing fear were ultimately struck from the jury panel. Although the nature of the trial justified respondent’s concern, without the sketch order the harm posed by the coverage was less than grave.
Second, were there other measures short of a prior restraint which would have adequately protected the fairness of the trial? Other measures short of a prior restraint were available, and some were employed. Two common alternatives to prior restraint are thorough voir dire and sequestration of the jury during the trial. See Nebraska Press Ass’n. v. Stuart, supra, 427 U.S. at 564, 96 S.Ct. at 2805. See also Rules 18.5(d), 19.4, Arizona Rules of Criminal Procedure, 17 A.R.S. Searching voir dire questioning did indeed take place. Prospective jurors answered a lengthy questionnaire that revealed the “gruesome nature of the homicides” and that the homicides occurred in a private residence. The parties and respondent conducted individual voir dire for over two weeks. Finally the use of strikes for cause and peremptory challenges apparently removed those jurors who actually expressed fear. It must be noted, however, that the trial judge represented to the jury panel that jurors would not be photographed for television. While this assurance may have weighed with some jurors there was no record made that any member of the jury was concerned about the sketches being shown on television.
The third consideration is the effectiveness of the order. Simply put, the sketch order was completely ineffective to protect the identities of the jury and the fair trial rights of the accused. First, the order did not prohibit the print media from publishing jury sketches. At least one newspaper published a sketch of the jury. Surely the harm, to the extent it existed, would manifest itself greater in the more permanent medium of print. In addition, the trial was completely open from its beginning. From October 18, when jury selection began, to December 24, when the jury returned its verdict, anyone desiring familiarity with jury names and faces had ample opportunity to do so by the simple device of attending the trial and examining the minutes filed in the case.
We conclude that the perceived harm falls short of the Stuart test. Jury fear was neither significant nor imminent enough to justify the censorship, less restrictive measures would have sufficed, and the sketch order promised very limited success in tempering the media involvement.
The effect of the restraint was an infringement of petitioners’ First Amendment right to attend and report on public criminal trials. See Globe Newspaper Co. v. Superior Court, supra, 457 U.S. at 603, 102 S.Ct. at 2618. But “once a public hearing had been held, what transpired there could not be subject to prior restraint.” Nebraska Press Ass’n. v. Stuart, supra, 427 U.S. at 568, 96 S.Ct. at 2807. “Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom.” Estes v. Texas, 381 U.S. 532, 589, 85 S.Ct. 1628, 1663, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring). Part of what the media representatives in this case have seen in the courtroom is the jurors’ likenesses. We believe that sketches depicting jurors’ reactions and behavior are protected by the First Amendment right to attend a public criminal trial, because that information is garnered from information placed “in the public domain,” Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975), and because *253 “what transpires in the courtroom is public property.” Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). The likenesses of jurors were equally in “the public domain” as the rape victim’s name in Cohn.
While we invalidate the sketch order in this case, we do not rule out the possibility that threats to the fair-trial rights of a criminal defendant could justify some form of prior restraint. First Amendment rights are not absolute. “This Court ... has consistently rejected the proposition that a prior restraint can never be employed. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).” Nebraska Press Ass’n. v. Stuart, supra, 427 U.S. at 570, 96 S.Ct. at 2808. And, in the instant context, “[ajlthough the right of access to criminal trials is of constitutional stature, it is not absolute.” See Richmond Newspapers, Inc. v. Virginia, supra, 448 U.S. at 581, n. 18, 100 S.Ct. at 2830, n. 18 (plurality opinion); Nebraska Press Assn v. Stuart, 427 U.S. at 570, 96 S.Ct. at 2808.” Globe Newspaper Co. v. Superior Court, 457 U.S. at 606, 102 S.Ct. at 2620. The heavy presumption against the constitutionality of such restraints should limit their use in all but the most compelling circumstance.
In addition, we do not foreclose control of courtroom sketching where such sketching becomes so disruptive and distracting as to threaten the “judicial serenity and calm to which [a defendant is] entitled.” Sheppard v. Maxwell, supra, 384 U.S. at 355, 86 S.Ct. at 1518. In State v. Delvecchio, 110 Ariz. 396, 519 P.2d 1137 (1974), we stressed that “[a] trial judge has not only the right but the responsibility of seeing that trials are conducted properly and without disruption, and he is allowed to take those necessary measures to provide for the orderly disposition of criminal cases.” Id. at 400, 519 P.2d at 1141. Normally courtroom sketching should not endanger the fairness of a criminal trial, but if it becomes so distracting that it presents a danger to requirements of a proper trial, a trial court has the power to preserve decorum by issuing narrowly tailored orders addressing sketch artists and anyone else whose conduct threatens the fairness of the proceeding. See I ABA Standards for Criminal Justice, “Special Functions of the Trial Judge,” Standard 6-3.10 (2d ed. 1980). Orders preserving decorum would “resemble ‘time, place and manner’ restrictions ____” and would not be evaluated with strict scrutiny. Globe Newspaper Co. v. Superior Court, supra, 457 U.S. at 607, n. 17, 102 S.Ct. at 2620, n. 17. Instead, such restrictions would be upheld if they were reasonable, Richmond Newspapers, Inc. v. Virginia, 448 U.S. at 600, 100 S.Ct. at 2840 (Stewart, J., concurring in judgment), if they furthered “significant governmental interests,” Young v. American Mini Theatres, Inc., 427 U.S. 50, 63, n. 18, 96 S.Ct. 2440, 2449, n. 18, 49 L.Ed.2d 310 (1976), and if they did not “unwarrantly abridge ... the opportunities for the communication of thought.” Richmond Newspapers, Inc. v. Virginia, 448 U.S. at 581, n. 18, 100 S.Ct. at 2830, n. 18.
Although sketch artists at times may have to yield to regulation of the courtroom, this is not a case of regulation, but one of restraint. There is nothing in the record to suggest distracting conduct which could lead to orders properly geared to controlling the courtroom. Rather, the record clearly indicates that respondent’s attention focused not on conduct but on the content of the sketches. A similar practice was disapproved in United States v. Columbia Broadcasting System, Inc., 497 F.2d 102 (5th Cir.1974). In that case, the trial judge disallowed sketching in the courtroom and prohibited publication of any sketches, whether drawn in the courtroom or elsewhere. The appeals court invalidated the order banning sketching because there was “no showing whatsoever that sketching is in any way obtrusive or disruptive.” Id. at 107. The order prohibiting publication of sketches was held un *254 constitutional as a prior restraint too broadly drawn and too distantly related to the danger to a fair trial. Id. at 106. In this case we find the same problems.
The sketch order entered in this case was a classic example of a prior restraint. Even though no sketch was submitted under the order, censorship was at work. The record in this case indicates that petitioner Crow refrained from courtroom sketching, fearing contempt sanctions. Self-censorship, induced by the threat of contempt citations, is considered the worst harm of a prior restraint. “It is a sign of the times that all the leading writers on prior restraint in the last decade ... have treated the self-censorship phenomenon as either the exclusive or the central consideration in deciding whether prior restraints should be disfavored.” Blasi, Toward a Theory of Prior Restraint: The Central Linkage, 66 Minn.L.Rev. 11, 25 (1981).
We hold that the sketch order is an unconstitutional prior restraint of First Amendment expression based on the media’s lawful exercise of its right of access to the open criminal trial below.
MEDIA LIAISON ORDER
In his findings of December 20, 1982, the respondent judge described the background that persuaded him to grant both prosecution and defense motions to limit contact with the press. Respondent found,
“There are allegations of organized crime and gang activity in both Chicago and Phoenix. Allegations of widespread and serious criminal activity in the metropolitan Phoenix community. Allegations of professional contract murders, a business takeover, brutality in the homicides to ‘send a message.’ Intrusion into the privacy of a residence to commit the crimes charged herein. Extensive allegations of conspiracies, conspirators, known and unknown, captured and prosecuted and remaining free in the general Chicago and Phoenix communities, and elsewhere. Massive publicity since the night of the occurrences, December 31, 1980. At least one of the attorneys involved has been the subject of a magazine article — ‘Joe Brownlee — a prosecutor who plays hardball’ — November, 1982, issue of Phoenix Magazine.”
In those same findings, the respondent judge wrote that “the court in granting the order evaluated the press’ First Amendment rights against the participants’ Sixth Amendment rights to a fair trial.” The court concluded that “the least restrictive course of conduct was to restrict the enumerated classes and appoint a Court Media Liaison.”
Petitioners argue that the media liaison order constituted a prior restraint upon the media’s communication with the trial participants and is therefore presumptively unconstitutional. The respondents maintain that the so-called “gag” order does not in any manner affect media access to the trial or the media’s ability to report what transpired at trial. Unlike the sketch order we do not find that the “gag” order results in a prior restraint on the media. The order in no way infringed upon petitioners’ First Amendment right to attend and report on criminal trials, but only collaterally affected petitioners’ ability to interview the trial participants, an interest outside the scope of protection of the First Amendment right to attend and report on criminal trials.
Orders like the media liaison order have been suggested by various authorities since Sheppard v. Maxwell, supra, and we support their continued use, given the proper circumstances. See, e.g., In re Express-News Corp., 695 F.2d 807 (5th Cir.1982); United States v. Gurney, 558 F.2d 1202 (5th Cir.1977) cert. denied, sub. nom Miami Herald Publishing Co. v. Krentzman, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); United States v. Tijerina, 412 F.2d 661 (10th Cir.) cert. denied, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969); State ex rel. Miami Herald Publishing Co. v. McIntosh, 340 So.2d 904 (Fla.1977). The “carnival atmosphere” present in Sheppard caused the Court to recommend different measures to control the courtroom *255 during a well publicized trial. One such measure is the proscription of “extrajudicial statements by any lawyer, party, witness, or court official____” Sheppard v. Maxwell, supra, 384 U.S. at 361, 86 S.Ct. at 1521. The Court admonished:
The Courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for the defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court staff should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.
Id. at 363, 86 S.Ct. at 1522. See Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the “Free Press — Fair Trial” Issue, 87 F.R.D. 519, 525-532 (1980); II ABA Standards for Criminal Justice, “Fair Trial and Free Press,” Standard 8-3.6. (2d ed. 1980). The Court in Stuart, supra, mentioned limiting what trial participants may say to anyone, as an alternative to prior restraint of publication. Id., 427 U.S. at 564, 96 S.Ct. at 2805.
Petitioners argue that Sheppard warranted such restrictions, but the Bracy/Hooper trial did not. The differences between the two trials are evident. However, a trial court’s obligation to assure an accused a fair trial does not rise and fall depending on the level of activity and the degree of attention given by the media to the trial. The obligation is constant although the measures for protection of a fair trial will necessarily differ depending upon the circumstances.[9]
As support for invalidating the “gag” order, petitioners cite CBS, Inc. v. Young, 522 F.2d 234 (6th Cir.1975). There the trial judge entered an order similar to the instant order, in connection with a civil trial arising out of the Kent State tragedy. The order enjoined “all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends and associates ... from discussing in any manner whatsoever these cases with members of the news media or public.” Id. at 236. The federal court of appeals decided the order was an invalid prior restraint. Id., 522 F.2d at 240.
Petitioners’ reliance on Young is misplaced. First, the order there was much broader, both in duration and persons enjoined. Second, the appellate court found a lack of evidence justifying restraint of the trial participants. In the Bracy/Hooper trial, there was substantial evidence to justify the action taken. Third, Young was a civil trial. In the criminal trial before respondent, the fair-trial goals were constitutional requirements. Fourth, Young preceded the plethora of authority discussed before which supports orders like the media liaison order. Finally, and most significantly, Young was decided without the guidance of the recent right of access cases. Since Young was decided, the media’s “right” to gather information during a criminal trial has been limited to attending the proceedings and carrying away their observations for later reporting. We believe that neither the relevant ease law nor the reasons for protecting the media’s right of access to criminal trials compel extending that right to interviewing trial participants.
A review of the recent United States Supreme Court opinions addressing the right of the press to attend criminal trials demonstrates that the media’s right is no more than a right to attend. In Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), *256 the Court decided that “[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public.” Id. at 609, 98 S.Ct. at 1318. The Court held that neither the First nor the Sixth Amendment required the release for reproduction and broadcast of certain tapes that had already been played as exhibits in open court. We conclude that the “news gathering right” in the context of criminal trials means nothing more nor less than the right to attend. See United States v. Hastings, 695 F.2d 1278, 1280 (11th Cir.), cert. denied, sub nom. Post-Newsweek Stations, Florida, Inc. v. United States, — U.S.-, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983).
Moreover, the policies underlying recognition of the right are completely consistent with our conclusion that interviewing trial participants falls outside of the right of access. There are two main reasons behind the right of access: “[fjirst, the criminal trial historically has been open to the press and general public,” and “[sjecond, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole.” Globe Newspaper Co. v. Superior Court, supra, 457 U.S. at 605-606, 102 S.Ct. at 2619-2620. Nowhere in the extensive history of the public nature of criminal trials related in Richmond Newspapers can be found right of access protection for interviewing trial participants. Further, the significant role played by the media’s exercise of its right of access does not depend on interviewing trial participants before or during the trial. Petitioners point out that the media often require guidance and analysis of what transpires at trial. While we agree, we are not constitutionally mandated to provide such guidance.
We do not suggest “that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated.” Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). But in the context of the criminal trial, the right to gather news means precisely the right to attend the trial and report on what transpires. The following language illustrates: “[i]t is not crucial whether we describe this right to attend criminal trials to hear, see, and communicate observations concerning them as a ‘right of access,’ or a ‘right to gather information’ ____” Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980) (citations omitted). The Richmond Newspapers opinion borrowed the “right to gather information” language from the same Branzburg language quoted above, and proceeded to define that “right” as only a right to sit, listen, watch, and report.
We do not find that the media liaison order affected in the least petitioners’ right to attend a criminal trial. Petitioners were able to observe the proceedings, and report their observations with impunity. We find that “[njeither the purpose of the [order] nor its effect is primarily to deny the press or public access to information [guaranteed by the right to attend criminal trials]____” Globe Newspaper Co. v. Superior Court, supra, 457 U.S. at 616, 102 S.Ct. at 2625 (Burger, C.J., dissenting). We “therefore need only examine whether the restrictions imposed are reasonable and whether the interests of the [state] override the very limited incidental effects of the [order] on First Amendment rights. See Richmond Newspapers, supra, 448 U.S. at 580-581, 100 S.Ct. at 2829-2830 (1980) (plurality opinion); Id., at 600, 100 S.Ct. at 2840 (Stewart, J., concurring in the judgment); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).” Id. The respondent judge could reasonably have concluded from the matters presented to him that the order was necessary. The order coincides with the long standing goal that “the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any *257 outside influence, whether of private talk, or public print.” Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) (Holmes, J.). The governmental interest in a fair trial for both the prosecution and the defense outweighed the collateral effect on petitioners’ desire for pretrial interviews of witnesses. We hold that the media liaison order was a proper exercise of respondent judge’s duty to protect the accuseds’ right to a fair trial.
CONCLUSION
For reasons stated before, we grant petitioners’ requested relief as to the sketch order, and it is vacated. The petitioners’ request for relief as to the media liaison order is denied.
GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

. A similar petition challenging the same two orders was filed in Brice v. Superior Court. Our decision in that case is found at 138 Ariz. 260, 678 P.2d 445 (1984).

. The two previous cases were State of Arizona v. McCall and Cruz, Maricopa County Superior Court Case Nos. CR-116940 and CR-120721, and State of Arizona v. Lukezic, Maricopa County Superior Court Case No. CR-121686. See State v. Cruz, 137 Ariz. 541, 672 P.2d 470 (1983); State v. McCall, 139 Ariz. 147, 677 P.2d 920 (1983).

. First Amendment Coalition of Arizona, Inc. and Ken Montoya v. Superior Court, Maricopa County and Honorable Cecil B. Patterson, Jr., No. 16325-SA.

. Petitioners also applied for a stay of the orders with Justice Rehnquist, sitting as Circuit Justice, on December 17, 1982. On December 23, 1982, he denied the application. See KPNX Broadcasting Co. v. Arizona Superior Court, 459 U.S. 1302, 103 S.Ct. 584, 74 L.Ed.2d 498 (1982).

. On June 30, 1983, we issued an order amending Rule 45, Canon 3(A)(7), 17A A.R.S.Rules of the Supreme Court (Code of Judicial Conduct), effective July 1, 1983. The amended rule, which incorporates our guidelines, vests the judge of the particular proceeding with sole discretion to decide whether to permit electronic or still photographic coverage. Under both the December 23 order and the amended rule, electronic or still photographic coverage of juvenile court or adoption proceedings was and continues to be prohibited.

. "* * * [N]ews reporters or other media representatives not using cameras or electronic equipment shall not be subject to these guidelines.”

. “Members of the media who do not propose to sound record or photograph any of these proceedings are not affected by these guidelines.”

. We note that Rule 45, Canon 3(A)(7), as amended, retains the language excluding from its guidelines "media representatives not using cameras or electronic equipment.” Rule 45, Canon 3(A)(7)(i), 17A A.R.S.Rules of the Supreme Court. The guideline about coverage of jurors includes stronger language; such coverage by electronic and still photographic equipment “in a manner that will permit recognition of individual jurors by the public is strictly forbidden." Rule 45, Canon 3(A)(7)(k), 17A A.R.S. Rules of the Supreme Court, (emphasis supplied).

. We note the different alternatives include exclusion of all spectators except the press where the court finds "that an open proceeding presents a clear and present danger to the defendant’s right to a fair trial by an'impartial jury." Rule 9.3(b), Arizona Rules of Criminal Procedure, 17 A.R.S. Before closure, the trial court must find that less restrictive alternatives will not suffice. The less restrictive alternatives include continuances, change of venue, sequestration, emphatic instructions, and limitations on trial participants’ contact with media.