**UNITED STATES of America**

v.

**Marvin MANDEL et al.**

**Crim. No. HM75–0822.**

United States District Court, D. Maryland.

Dec. 19, 1975.

Jervis S. Finney, U. S. Atty. D. Md., Asst. U. S. Attys., Barnet D. Skolnik, Ronald S. Liebman and Daniel J. Hurson, for United States.

Arnold M. Weiner, Baltimore, Md., for Marvin Mandel.

William G. Hundley, Washington, D. C., for W. Dale Hess.

Thomas C. Green, Washington, D. C., for Harry W. Rodgers, III.

Michael E. Marr, Baltimore, Md., for William A. Rodgers.

Norman P. Ramsey, Baltimore, Md., for Irvin Kovens.

Joseph A. DePaul, College Park, Md., for Ernest N. Cory, Jr.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

On November 24, 1975, the Grand Jury for the District of Maryland returned a 24-count indictment against Marvin Mandel, Governor of the State of Maryland, and five co-defendants, charging mail fraud and prohibited patterns of racketeering activities in violation of federal law.

The case is presently before the Court on a request by the United States for what is popularly described as a gag order. More specifically, the government by petition asks the Court to prohibit "all parties, witnesses, attorneys and agents in this case from making any extrajudicial public statements relating to the case, without prior written approval of the Court."

Two of the defendants, Marvin Mandel and Ernest N. Cory, Jr., have both filed answers to the petition which oppose the imposition of a restrictive order. While other defendants have taken no position on the petition, because of their announced intention to move for a change of venue, no defendant has spoken in favor of the proposed order.

After full consideration the Court has concluded that the petition at the present time should be denied for the reasons which follow.

As authority for the issuance of the proposed order, the government in its petition referred to Rules 16, 17 and 18 of the Local Rules of this Court. Rule 16 deals with the release of information by attorneys in criminal cases; Rule 17 with the release of such information by personnel of this Court. Both rules are standing rules of the Court and require no motion by parties to invoke them. They operate at all times, for all criminal cases in this Court, and apply to all the persons mentioned therein. They are a resource to be utilized by the Court in case of need in this or any other criminal case. Motions may be made under Rule 18 which provides:

> In a widely publicized or sensational case, the Court, on motion of either party or on its own motion, in the exercise of its general powers, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury. . .

As grounds for urging issuance of a special order, the government in its petition asserted

1. Throughout the course of the grand jury investigation which culminated in the return of the indictment in this case, information relating to

the investigation has been supplied to the media by various persons whose identities have in many cases been unknown.

2. Until the filing of the Indictment, this Court has had jurisdiction over only some of the people having access to relevant information. Witnesses before the grand jury, those under investigation, and associates of those in both categories have been free to speak to the media regarding the investigation. Many have done so.

3. The Government has made clear throughout the course of the investigation that it would favor the issuance of an order prohibiting extrajudicial statements about the case if and when the Court were to acquire jurisdiction over all persons with relevant information. That time has now arrived.

At oral argument on the petition following the arraignment of defendants on December 4, 1975, government counsel urged that the defendant Mandel, as Governor, had a unique and virtually unlimited access to the press and was engaged in "deliberate manipulation of the media in an attempt to subvert potential jurors." These statements were made against the backdrop of press coverage of a 19 page letter from the defendant Mandel to Assistant Attorney General Richard L. Thornburgh, head of the Justice Department's criminal division, in which among other charges the defendant Mandel asserted that he had been the target of a "concerted effort by federal prosecutors in Baltimore to prosecute me, or at least destroy me politically." The letter, although dated November 7, 1975, in some unspecified manner became available to the press for publication in the afternoon papers of December 3, 1975 and the morning paper of December 4, 1975. The arraignment of the defendants took place at 3:00 p. m. on December 4, 1975. In apparent reference to this and other press coverage in the days preceding arraignment, the government urged that defendant Mandel had already fired "the opening salvoes of a campaign to prejudice potential jurors in this case."

The answers filed to the government's petition take the position that issuance of an order prohibiting extrajudicial statements would violate the First Amendment of the Constitution in that it would constitute an impermissible prior restraint on the exercise by defendants of their right of free speech and would also be void because of its overbreadth, vagueness and imprecision. Additionally, it is claimed that the proposed order, insofar as it would place limitations on the statements of witnesses, and upon free intercourse between the witnesses and the defense, would violate the rights of the defendants to due process of law and to a fair trial as guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States.

Although the Court at oral argument on the petition indicated that for the present it would consider only the arguments of the parties before it, legal motions opposing the proposed order were filed shortly before the hearing by the A. S. Abell Company, publishers of the Sunpapers, the Hearst Corporation which publishes the News American, the Reporters Committee for Freedom of the Press, WRC–TV of Washington, Westinghouse Broadcasting Corporation, and several individual Baltimore and Washington newspaper and television reporters assigned to cover the case. All of these motions urged against any form of order which would restrict the right of the media to gather and report news of great public interest.

The government at oral argument sought to dismiss these "cries of alarm" as "specious". It urged that there would be no restriction on freedom of the press because the proposed order by its terms imposed no direct restraints on publication but only on statements by "parties, witnesses, attorneys, and agents" made outside of court without the Court's prior written approval. It further claimed that the requested order would in no way restrict anyone from saying anything he or she pleased about the case, but would only require that whatever was said be said in the courtroom. For both reasons the government argued it

would be inappropriate to characterize the requested order as a "gag rule". However, it seems to the Court that to impose the restrictions on the speech of all individuals connected with the case as contemplated by the order would inhibit press coverage to almost the same extent as a restriction laid directly upon the publishers of news. The Court agrees that statements which bear on matters of an evidentiary nature should be aired only in the courtroom. However, the proposed order cuts a much broader swath, and the Court is not convinced that a restrictive order is presently needed to inhibit comments going to the merits of the case.

Defendants, as has been noted, also attack the terms of the proposed order for vagueness and overbreadth. Paragraph 1 prohibits "any extrajudicial public statements." Paragraph 2 then states:

> For purposes of this Order, the term 'extrajudicial statement' shall include any statement which is not made during the course of judicial proceedings in this case, and which is likely to interfere in any way with the rights of either or both sides in this case to a fair trial, except that nothing in this Order shall preclude the parties and their attorneys and agents from conducting appropriate interviews of potential witnesses or conferring among themselves in preparation for trial.

Defendants argue that by its terms the proposed order prohibits variously "extrajudicial public statements" and "extrajudicial statements", and does not attempt to define prohibited statements but provides only that they "include any statement . . . which is likely to interfere in any way" with a fair trial. The order they contend also attempts to regulate interviews with witnesses, permitting only those which are described, without definition, as "appropriate". It is also vigorously urged that the final paragraph of the order would have a chilling effect on defendants' rights to conduct even "appropriate" interviews with witnesses. It provides:

> A copy of this Order shall be served with each subpoena served on behalf of the United States or any defendants.

It is contended that to permit the government to issue subpoenas and attach thereto a restrictive order would inhibit the defense by at least impliedly threatening the prospective witnesses with possible contempt citations if anything appeared in the press about the witness or if for some reason any interview between the witness and defendants and their counsel were deemed "inappropriate."

Additionally, it is separately urged as to the defendant Mandel that as an elected public official, he is frequently required to exchange views and otherwise participate in debate before governmental bodies and other forums. In his position, it is urged that he is peculiarly subject to criticism by the press and other persons whose comments would not be embraced within the proposed order. It is contended that these special circumstances militate strongly against the imposition of any prohibition upon the defendant's right to free expression.

It is obvious that this case presents elements of what has been called the "classic confrontation" between two fundamental and cherished freedoms—the right of free speech and free press under the First Amendment and the right to have a criminal case tried by a fair and impartial jury under the Sixth Amendment. However, the confrontation here arises in a framework that is somewhat unique. In the usual case a defendant charged with a crime of violence claims that the publicity given the circumstances of the crime and the prejudicial effect of publication of statements by police, investigators or witnesses will deprive him of his right to a fair trial. In such circumstances it is the *defendant* who seeks court enforced curbs on prejudicial publicity. In the present case it appears that the *government* is seeking the order because the defendants have ready access to the media and any frequent assertion in the press by defendants of

their innocence of the charges against them or the reporting of interviews in which the defendants attack the *bona fides* of the prosecution or the motives of the prosecutors may effectively prevent unbiased consideration by a trial jury of the government's case against the defendants. That the government's fears in this connection may not be entirely unwarranted is evident from even a cursory perusal of the defendant Mandel's November 7, 1975 letter to Assistant Attorney General Thornburgh, the text of which has already been given wide publicity. Of course, equally wide publicity was given to the full text of the indictment returned by the grand jury against the defendants.

■ Both sides to the present case are entitled to have it tried by a fair and impartial jury. It is not conducive to the selection of such a jury if in advance of trial, statements on the substance of the case are made "in unilateral press conferences or anonymous leaks". As Justice Black put it in *Bridges v. California*, 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192:

> The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper.

These observations would certainly seem to have relevance to the pending case. However, it is equally relevant to note that in the very next sentence, Justice Black stated:

> But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases.

■ To justify the imposition of a restrictive order at this time, four and a half months in advance of the scheduled trial date of May 3, 1976, the government must show that the publicity the case has already had or may have between now and trial has been and would be so prejudicial that a jury which could hear the government's case with an open mind could not be selected, or that other measures to insure a fair trial are unavailable to the Court. In the Court's view, the government has failed to meet this burden.

■ There are of course several methods for protecting a trial from the effects of prejudicial publicity. They have been outlined by Mr. Justice Tom C. Clark in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in the ABA Standards Relating to Fair Trial and Free Press, "Part III, Recommendations Relating to the Conduct of Judicial Proceedings in Criminal Cases," and in the Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" issue, 45 F.R.D. 391 (often referred to as the Kaufman Committee report).

Among the recommendations of the Kaufman Committee report was the adoption by each District Court of Rules of Court relating to the release of information by attorneys in criminal cases, the release of information by courthouse personnel in criminal cases, and provisions for special orders in widely publicized and sensational cases. This Court has adopted such rules in its Local Rules 16, 17 and 18, in language substantially identical to that recommended by the Kaufman Committee. The Court will enforce these rules, whenever necessary to insure a fair and impartial trial. This Court has also adopted in its Local Rule 15 the recommendations of the Kaufman Committee relating to the use of photography, radio and television equipment in the courtroom and its environs, as since expanded by resolution of the Judicial Conference of the United States. The Court expects to enforce this rule, any violation of which by its terms subjects the violator to discipline by the Court, as for contempt of court.

Additionally, there are available to the Court the traditional safeguards of continuance, change of venue, sequestration of jurors and witnesses, voir dire of prospective jurors and cautionary instructions. Some or all of these alternative procedures, at least at present, appear substantively preferable to the use of a judicial restrictive order.

■ The Court is also sensitive to the fact that the public has an overriding interest in seeing that justice is fairly administered. This interest is unquestionably heightened when, as in this case, charges have been brought against the Governor of the state, and where allegations have been made by the Governor that the prosecution is politically motivated. It is clear that under these circumstances there should be as free a flow of information as possible, consonant with the right of defendants and the prosecution to a fair trial. The public has an interest in knowing that the prosecution is brought in good faith and in appraising the integrity of the judicial process in deciding the case. As the Fifth Circuit Court of Appeals speaking through Chief Judge John R. Brown noted in a somewhat different context in *United States v. Dickinson*, 465 F.2d 496, 501 (1972):

> Particularly is maximum freedom of the press required where the trial is intended to 'determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will', *Wood v. Georgia*, 1962, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580. 'The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings'. *Estes [Estes v. Texas], supra*, 381 U.S. [532] at 539, 85 S.Ct. [1628] at 1631 [14 L.Ed.2d 543]. Therefore, 'particularly in matters of local political corruption and investigations it is important that freedom of communications be kept

open * * *.' *Wood, supra*, 370 U.S. at 390, 82 S.Ct. at 1373.

■ Many of the same considerations serve to make the First Amendment claim of the defendants a substantial one. In a case such as this, involving charges against an important elected public official and countercharges by that public official that the prosecution is out to destroy him politically, care must be taken to balance carefully his right and the right of his codefendants to discuss the charges with the right of both sides to a fair trial. *Cf. Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959).

In the only federal appellate opinion in which a defendant in a criminal case sought, on First Amendment grounds, to remove a restrictive order similar to the one proposed here, the Seventh Circuit, in *Chase v. Robson*, 435 F.2d 1059 (1970), stated:

> while we agree '[i]t is fundamental to our system of constitutional democracy that issues of law and fact in a criminal proceeding be resolved in the courts, and not in the news media nor in the streets,' we believe equally fundamental to our system is the right of all citizens, *even if they be criminal defendants* to exercise their first amendment rights. *In the absence of a clear showing* that an exercise of those first amendment rights will interfere with the rights of the *government and the defendants* for a fair trial, we reject this prior restraint on first amendment freedoms. (emphasis added)

In giving recognition to the public's "right to know" and the defendants' right of freedom of speech, the Court's opinion today should not be construed as a license to either the prosecution or the defense to try the merits of this case in any forum other than a court of law. Denial of the government's petition does not mean that it may disseminate information about the case in the media if, in the language of the Court's Local Rule

16, "there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." The strictures of this Rule also apply with equal force to counsel for defendants. The Court also points out that if the defendants conceive the Sixth Amendment to give them a right to themselves create prejudicial publicity by trying the government in the press in advance of the trial in court on the charges in the indictment, then they would have a fundamental misconception of the purpose of that amendment. Such activity on their part might well invite the imposition of the type of restrictive order they now oppose.

Finally, the Court emphasizes that this case has been set for trial in a court of law, to be tried under ancient principles for an orderly and just adjudication of the serious criminal charges which have been made in this case. The safeguards built into the judicial process by the Constitution are not inherently powerful. The Court will do all in its power to see they are applied. In the final analysis, however, the Court must depend on the support and respect for the administration of justice by the press, the parties and the public. It does not take much to destroy those safeguards. Until such time as the trial begins, the defendants must be presumed to be innocent, and that presumption does not disappear until such time, if ever, as the government proves that they are guilty beyond a reasonable doubt to a jury of impartial men and women. While the Court does not feel that the government has, at this point in these proceedings, demonstrated that failure to pass the proposed order will imperil a fair trial, the point at which such an order might become appropriate can only be hastened with every reported skirmish in the battle to enlist public opinion either in favor of or against the prosecution or the defense.

For all the reasons herein stated, it is this 19th day of December, 1975, by the United States District Court for the District of Maryland,

*ORDERED* that the Petition of the United States for an Order Prohibiting Extrajudicial Statements be, and the same hereby is, *Denied*, without prejudice to being again invoked should altered circumstances warrant such action.