**Joel LEVINE, et al., Petitioners,**

v.

**UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF CALIFORNIA, Respondent,**

**United States of America, Real Party in Interest.**

**No. 85–7208.**

United States Court of Appeals, Ninth Circuit.

Submitted May 20, 1985.

Decided June 24, 1985.

As Amended Aug. 19, 1985.

Sneed, Circuit Judge, filed concurring opinion.

Nelson, Circuit Judge, filed opinion concurring in part and dissenting in part.

Paul L. Hoffman, Joan Howarth, ACLU Foundation of Southern Cal., Douglas E. Mirell, David P. Crochetiere, Los Angeles, Cal., for petitioners.

Robert C. Bonner, U.S. Atty., Robert L. Brosio, Russell Hayman, Asst. U.S. Attys., Los Angeles, Cal., for respondent Dist. of Cal., etc.

Before SNEED, NELSON and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Richard W. Miller and his attorneys, Stanley I. Greenberg and Joel Levine, seek a writ of mandamus compelling the district court to dissolve a restraining order that prohibits the attorneys involved in Miller's trial from communicating with the media regarding the merits of the case. To determine the validity of the order, we must address the clash between the basic and fundamental right to a fair criminal jury trial and the first amendment right of attorneys to engage in free speech.

## I

### BACKGROUND

On October 2, 1984, Richard W. Miller, a former special agent with the Federal Bureau of Investigation, was arrested and charged with espionage. Miller allegedly passed classified documents to Svetlana Ogorodnikova and Nikolay Ogorodnikov, who were also charged with espionage. An indictment was returned naming all three defendants on October 12. A superseding indictment was returned in November. On January 22, 1985, the district court severed the trial of Miller from the trial of the Ogorodnikovs. The trial of the

Ogorodnikovs is currently proceeding, while Miller is still awaiting trial.

The criminal proceedings against Miller have received extensive local and national media coverage. Early in the proceedings, the district court became aware that both government officials and defense attorneys had engaged in "on the record" interviews with media representatives. In early November 1984, the district court admonished counsel not to engage in pretrial publicity. On November 28, the government sought an order that would specifically proscribe the making of any extrajudicial statement to the press concerning matters related to the prospective trial of the defendants. The motion was denied on December 14, but the district court again admonished counsel to maintain an atmosphere in which a fair trial could be conducted. The court sought the cooperation of counsel. Defense counsel advised the court that they might "at some future time deem it necessary in the interest of our client to make a statement outside the courtroom."

Shortly before the beginning of the Ogorodnikovs' trial, the *Los Angeles Times* published an article by staff writer William Overend that quoted numerous statements attributed to defense attorneys. *Lawyers Contend FBI Exaggerated Evidence in Spy Case*, L.A. Times, Mar. 3, 1985, pt. 1, at 3. The article summarized the attorneys' statements as follows:

> Defense lawyers in the Richard W. Miller spy case have accused the FBI of initially exaggerating the evidence against Miller and two Russian emigres charged with conspiring to pass secret government documents to the Soviet Union.
>
> They said in interviews last week that the three accused spies should never have been prosecuted for espionage because the government has been unable to establish that Miller actually passed any documents to Svetlana Ogorodnikova or her husband, Nikolai Ogorodnikov, or caused any harm to the security interests of the United States.

A federal prosecutor declined to respond to the comments on grounds that a judge has asked all parties in the case to avoid public discussion of the evidence.

Initially, the attorneys focused on the prosecution's decision to drop four counts of aiding and abetting espionage against the Ogorodnikovs:

> "The dismissal of these charges means the government has now conceded that no documents were ever passed. It's also a concession that there's been no damage to national security," said Gregory P. Stone, one of Ogorodnikova's lawyers.
>
> "I don't think the case should ever have been brought. The initial characterization by the government that this was a major espionage case with untold damage was an incorrect assessment."
>
> "They acted hastily in filing the espionage charges," added Stanley Greenberg, one of Miller's lawyers. "To a large extent, the FBI misled the U.S. attorney's office about the strength of the case until it was too late."

The attorneys then set forth the defense theory in great detail. Finally, they attacked the basis of the prosecution's case:

> Greenberg, joining the criticism of the initial FBI reaction to Miller's activities, said Miller's comments were the "sole basis" for initially charging the Ogorodnikovs with receiving secret documents.
>
> "Those two people were indicted with the hope that the charges could be substantiated, and they haven't been able to do it," Greenberg said. "The only reason Miller is still charged with passing documents is that he admitted it after five days of questioning, and he'd already told them he'd say anything just to end the questioning.
>
> "If he had admitted passing pumpkin papers from the Alger Hiss case, I think he'd be charged with it," Greenberg added.
>
> . . . .
>
> "We've got two dummies here, no question about that," [Greenberg] said. "But these people should have never

been taken seriously as spies. It's unrealistic to talk about the Miller case in the same breath as other espionage cases that have come along in the last few years."

. . . .

[Randy Sue] Pollock, representing Nikolai Ogorodnikov, agreed with the other defense lawyers that the government's case against all three defendants appeared weaker than originally presented. She added that the case against her client was regarded by all of the defense lawyers as the weakest of all.

"He's not involved in this thing. None of us understand why he was indicted," she said. . . .

In response to the *Los Angeles Times* article, the government filed an ex parte application to renew its motion for a restraining order regarding extrajudicial statements. A hearing was held on March 5, 1985. At the hearing, Levine acknowledged that he had spoken to Over, although the article did not quote him. After reviewing the statements of counsel in that article, the district court ordered:

> [T]hat all attorneys in this case, all parties and all their representatives and agents of counsel and the parties shall not make any statements to members of the news media concerning any aspect of this case that bears upon the merits to be resolved by the jury.

> This order shall remain in force during the pendency of this action or until further order of this court. No person covered by this order shall avoid its effects by indirectly but deliberately taking actions which bring about a violation of the order.

> And I should include in that order witnesses, too . . . and I do.

On June 11, 1985, the district court removed the parties and witnesses from the scope of the order. The revised order applies only to the attorneys for the government and the defendants.

The Ogorodnikovs, their attorneys, and the various media organizations that may be affected by the order are not parties to this proceeding. Miller has remained in custody since his arrest in October 1984. While in custody, he has been denied any contact with media representatives. During the Ogorodnikovs' trial, however, Miller testified in open court pursuant to a grant of limited immunity.[1] Levine and Greenberg will represent Miller in his jury trial before the district court.

## II

### JURISDICTION

We have jurisdiction to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a). Nevertheless, mandamus is an extraordinary remedy that is employed only in extreme situations. *Clorox Corp. v. United States District Court,* 756 F.2d 699, 700 (9th Cir.1985). In *Bauman v. United States District Court,* we set forth five guidelines for determining the appropriateness of issuing a writ of mandamus:

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order

---

**1.** Under the facts of this case, we reject the argument that a restraining order against Miller's attorneys prevents Miller from communicating with the media. By testifying at the Ogorodnikovs' trial, Miller was able to communicate his version of the events in question to the media. We also note that the district court's order does not prevent Miller from issuing a statement to the media through his family members. Finally, we observe that the restraining order only limits *extrajudicial* statements by Miller's attorneys.

Miller's attorneys are free to present Miller's case in open court. Accordingly, we need not decide whether a restraining order against defense attorneys is permissible when the defendant cannot communicate with the media.

We also note that the present petition does not challenge the government's ability to deny Miller direct contact with the media. *Cf. Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Main Road v. Aytch,* 522 F.2d 1080 (3d Cir.1975).

raises new and important problems, or issues of law of first impression. 557 F.2d 650, 654–55 (9th Cir.1977) (citations omitted). The first two *Bauman* guidelines support an exercise of our mandamus jurisdiction. *See CBS, Inc. v. United States District Court,* 729 F.2d 1174, 1177–78 & n. 2 (9th Cir.1984); Rendleman, *Free Press-Fair Trial: Review of Silence Orders,* 52 N.C.L.Rev. 127 (1973). The fourth *Bauman* guideline does not apply in this case. The fifth *Bauman* guideline is also inapplicable in light of the numerous prior decisions in this circuit and in other jurisdictions. Accordingly, the third *Bauman* guideline is critical. A simple showing of error will not satisfy this guideline. *See Town of North Bonneville v. United States District Court,* 732 F.2d 747, 750 (9th Cir.1984); *United States v. Brooklier,* 685 F.2d 1162, 1173 (9th Cir.1982). We have held that an order is "clearly erroneous as a matter of law" if we are left with the definite and firm conviction that a mistake has been committed. *United States v. Harper,* 729 F.2d 1216, 1222 (9th Cir.1984). With that standard in mind, we turn to the merits of the petitioners' claims.

### III

### FREEDOM OF THE PRESS

The petitioners seek to characterize the district court's order as an unlawful prior restraint on the press. We have invalidated prior restraints on the reporting of events relating to a criminal proceeding. *E.g., CBS,* 729 F.2d at 1178–79; *see Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *ABA Standards for Criminal Justice* Standard 8–3.1 (1982). We have also invalidated restraints on the access of the media to criminal proceedings. *Associated Press v. United States District Court,* 705 F.2d 1143, 1145–47 (9th Cir.1983); *see Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The restraint that the district court issued is different from the restraints that we considered in *CBS* and *Associated Press.* The district court's order neither denies the media access to any criminal proceeding nor bars the media from disseminating any information that it obtains. On the contrary, the media is free to attend all of the formal proceedings before the district court and to report anything that happens. *See* Sack, *Principle and* Nebraska Press Association v. Stuart, 29 Stan.L. Rev. 411, 427–28 (1977) (noting the "fundamental difference" between a restraining order against the press and a restraining order against trial participants); *cf. In re Halkin,* 598 F.2d 176, 195 & n. 44 (D.C.Cir. 1979) (noting that an order directed only against lawyers and litigants is less drastic than restraining the press).

The district court's order raises a freedom of the press issue that is analytically distinct from the issues that were raised in *Associated Press* and *CBS.* By effectively denying the media access to the litigants, the district court's order raises an issue under the first amendment by impairing the media's ability to gather news. *See Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972); M. Nimmer, *Nimmer on Freedom of Speech* § 4.09[B] (1984). *But see KPNX Broadcasting Co. v. Superior Court,* 139 Ariz. 246, 678 P.2d 431, 439–42 (1984) (holding that limitations on the media's ability to interview trial participants do not violate the first amendment). The petitioners argue that the district court's order constitutes an unconstitutional restraint on the media's ability to gather news.

We note, however, that none of the media organizations that could be affected by the district court's order have joined this action. In general, a party lacks standing to assert the rights of third parties. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.9 (1984). The rule against third party standing is subject to several well-established exceptions. *See id.* Under the present procedural posture of this case, none of those exceptions apply. Accordingly, we conclude that the petitioners lack standing to assert the constitutional rights of nonparty media organizations.

## IV

## FREEDOM OF SPEECH

### A. *The Appropriate Legal Standard*

 The petitioners contend that the district court's order is a prior restraint on their first amendment right to free speech. We agree that the district court's order is properly characterized as a prior restraint. *See* M. Nimmer, *supra,* § 4.03. Prior restraints are subject to strict scrutiny because of the peculiar dangers presented by such restraints. *See id.* § 4.04; L. Tribe, *American Constitutional Law* § 12–32 (1978). Accordingly, the district court's order may be upheld only if the government establishes that: (1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest, *United States v. Sherman,* 581 F.2d 1358, 1361 (9th Cir. 1978); *see Wood v. Georgia,* 370 U.S. 375, 383–85, 82 S.Ct. 1364, 1369–70, 8 L.Ed.2d 569 (1962); (2) the order is narrowly drawn, *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 183–84, 89 S.Ct. 347, 352–53, 21 L.Ed.2d 325 (1968); *Halkin,* 598 F.2d at 193–94; *Sherman,* 581 F.2d at 1361; and (3) less restrictive alternatives are not available, *Nebraska Press Association,* 427 U.S. at 563, 96 S.Ct. at 2804; *CBS,* 729 F.2d at 1182–83.

We note that the district court's order applies only to trial participants. The Supreme Court has suggested that it is appropriate to impose greater restrictions on the free speech rights of trial participants than on the rights of nonparticipants. *Sheppard v. Maxwell,* 384 U.S. 333, 360–63, 86 S.Ct. 1507, 1521–23, 16 L.Ed.2d 600 (1966); *see Nebraska Press Association,* 427 U.S. at 564, 96 S.Ct. at 2805. The case for restraints on trial participants is especially strong with respect to attorneys. Justice Brennan analyzed the role of attorneys in this context as follows:

> As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice. It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases and to impose suitable limitations whose transgression could result in disciplinary proceedings.

*Nebraska Press Association,* 427 U.S. at 601 n. 27, 96 S.Ct. at 2823 n. 27 (Brennan, J., concurring) (citation omitted).[2] We recognize that attorneys and other trial participants do not lose their constitutional rights at the courthouse door. *See* L. Tribe, *supra,* § 12–11, at 627 n. 26; Freedman & Starwood, *Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys: Ratio Decidendi v. Obiter Dictum,* 29 Stan.L.Rev. 607, 614–18 (1977). Nevertheless, we must analyze the district court's order in light of the relationship

---

**2.** DR 7–107 of the *Model Code of Professional Responsibility* places specific limitations on extrajudicial statements by attorneys. *See also Model Rules of Professional Conduct* Rule 3.6 (1983); *ABA Standards for Criminal Justice* Standard 8–1.1 (1982). Several courts have held that attorney discipline is appropriate under DR 7–107 if there is a reasonable likelihood of prejudice to a fair trial. *E.g., Hirschkop v. Snead,* 594 F.2d 356, 365–70 (4th Cir.1979) (en banc); *In re Rachmiel,* 90 N.J. 646, 449 A.2d 505 (1982). A few courts have required either a serious and imminent threat to the administration of justice or a clear and present danger. *E.g., Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). *But cf.* Note, *A Constitutional Assessment of Court Rules Restricting Lawyer Comment on Pending Litigation,* 65 Cornell L.Rev. 1106 (1980) (arguing that the difference between the two standards is not constitutionally significant).

California has not adopted DR 7–107. In the context of an attorney's violation of a restraining order, however, a contempt conviction was evaluated under the "reasonable likelihood" standard. *Younger v. Smith,* 30 Cal.App.3d 138, 163, 106 Cal.Rptr. 225, 242 (1973); *see also Press-Enterprise Co. v. Superior Court,* 37 Cal.3d 772, 691 P.2d 1026, 1032, 209 Cal.Rptr. 360, 366 (1984) (applying the "reasonable likelihood of substantial prejudice" standard in deciding whether to allow media access to preliminary hearing transcripts).

The Central District of California has not adopted a local rule to deal specifically with extrajudicial statements. *Cf.* C.D.Cal.R. 2.5.2 ("No attorney shall engage in any conduct which degrades or impugns the integrity of this Court or in any manner interferes with the administration of justice therein."). We note that other districts have adopted such rules. *E.g.,* N.D.Cal.R. 130–2 (repealed 1983).

between the petitioners and the court system.

We also note that several other courts have considered similar restraining orders. The overwhelming majority of those courts have upheld the restraining orders. *E.g., In re Russell,* 726 F.2d 1007 (4th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984); *In re San Juan Star Co.,* 662 F.2d 108, 113–18 (1st Cir.1981); *United States v. Tijerina,* 412 F.2d 661 (10th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969); *Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 431 F.Supp. 1182 (D.S.C.), *aff'd in part,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978); *KPNX Broadcasting Co.,* 678 P.2d at 439–42; *State ex rel. Angel v. Woodahl,* 171 Mont. 13, 555 P.2d 501, 504 (1976); *Houston Chronicle Publishing Co. v. Hardy,* 678 S.W.2d 495 (Tex.App.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1754, 84 L.Ed.2d 817 (1985); *see also United States v. Schiavo,* 504 F.2d 1, 6 (3d Cir.) (en banc) (dictum in plurality opinion), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974). In dictum, we have encouraged the use of such orders. *Farr v. Pitchess,* 522 F.2d 464, 468–69 (9th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976). We are aware of only two cases in which restraining orders against trial participants were invalidated. In both cases, the court focused on the inadequacy of the district court's findings and the overbreadth of the restraint. *Halkin,* 598 F.2d at 196–97; *Chase v. Robson,* 435 F.2d 1059, 1061–62 (7th Cir.1970) (per curiam). In light of this backdrop, we now turn to an examination of the district court's order.

### B. *The Existence of a Serious and Imminent Threat to the Administration of Justice*

The sixth amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury...." A criminal defendant's right to a fair trial is an essential part of our system of justice. *Nebraska Press Association,* 427 U.S. at 551, 96 S.Ct. at 2799. In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Court placed the burden on the trial court to insure that media coverage does not affect the fairness of the proceeding. The Court stated:

> [T]here is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceeding threatens the fairness of a trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.

*Id.* at 362–63, 86 S.Ct. at 1522–23; *see Nebraska Press Association,* 427 U.S. at 551–55, 96 S.Ct. at 2799–2801. We have recognized that the *Sheppard* Court unequivocally imposed a duty upon trial courts to take affirmative steps to insure the fairness of a criminal proceeding in the face of excessive publicity. *Farr,* 522 F.2d at 468; *see also Hirschkop,* 594 F.2d at 366 n. 8 (noting that the language in *Sheppard* "is more nearly directive than suggestive").

■ The sixth amendment is a limitation on the government and does not give the prosecution the right to a fair trial. *See CBS,* 729 F.2d at 1184 (Goodwin, J., concurring). It does not follow, however, that the need to restrict publicity is lessened when the publicity is caused by the actions of the defense, rather than the prosecution. We must consider the fundamental interest of the government and the public in insuring the integrity of the judicial process. Society has the right to expect that the judicial system will be fair and impartial to all who

come before it. *Tijerina*, 412 F.2d at 666; *cf. Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961) (basing the existence of the exclusionary rule, in part, on " 'the imperative of judicial integrity' ") (quoting *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960)). As the Tenth Circuit noted, "The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect 'fair trials designed to end in just judgments.' " *Tijerina*, 412 F.2d at 666 (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)). The mere fact that a threat to the integrity of the judicial process is created by a private litigant, rather than by the government, is of little consequence. *See Chicago Council of Lawyers*, 522 F.2d at 254 (noting that "the Government is entitled to a fair trial"); *United States v. Mandel*, 408 F.Supp. 673, 677 (D.Md.1975). The potential for injury to the integrity of the judicial process is significant in cases involving trial publicity. As the Supreme Court has noted, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) (per Holmes, J.); *see Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965). This objective can be obtained only if publicity created by private litigants is subject to reasonable restrictions.

■ We do not mean to imply that the government has an absolute right to an impartial jury. Indeed, it is appropriate for the defense, within certain limits, to seek a jury that is partial to the defendant. The ability of the defendant to seek a partial jury must be limited, however, by the legitimate expectation of the government and the public that the judicial system will produce fair results. Accordingly, the judiciary cannot escape the task of fixing the limits within which a defendant may attempt to create publicity.

The district court based its decision to issue the restraining order on the existence of a serious and imminent threat to the administration of justice. The district court entered the following oral findings:

> [I]n view of the comments contained in the Los Angeles Times article, it is plain that the serious and imminent threat to a fair trial outweighs any First Amendment rights at stake. To claim that the need to argue a client's case in detail in the press on the eve of trial is mandated by an ethical or legal responsibility belittles the government's, the defendants', and most importantly in this instance, the public's right to a fair trial before an unbiased jury.

> With the nearness of trial, the potential for prejudice becomes particularly acute. There's nothing in the Code of Professional Responsibility requiring or even recommending that an attorney argue his or her case in the press or on the courthouse steps.

> Neither the press nor the public has the right to hear counsel argue their case prior to this court and the impaneled jury hearing the evidence, when doing so seriously impedes the fair and effective administration of justice. . . .

> Instead, it is the integrity of our judicial process that is fundamentally at stake. This trial will not become a circus show performed outside the courtroom, yet defense counsel's actions clearly foreshadow such an eventuality if this court does not take this action.

> . . . .

> However, the extent of such publicity in its prejudicial potential is of necessity speculative. . . . Nontheless [sic], based upon the details contained within the Los Angeles Times article, which this court is in no position to assess the veracity of and the motivations behind the article, this court finds it quite reasonable to expect that such publicity has been and

will become even more pervasive, creating in effect a lobbying effort by counsel on behalf of their clients. The public has a right to expect a fairer trial than that. The petitioners contend that the district court's findings were both inadequate and unsupported by the record.

■ Initially, the petitioners argue that the district court's order can be upheld only if the government has shown that an impartial jury cannot be selected. In two recent decisions, we invalidated prior restraints on the ground that it was inconceivable that pretrial publicity in Los Angeles could prevent the selection of an impartial jury. *CBS*, 729 F.2d at 1179–82 (invalidating an order restraining CBS from broadcasting a government surveillance tape prior to trial); *Associated Press*, 705 F.2d at 1146 (invalidating an order closing pretrial proceedings). In *CBS* and *Associated Press*, we relied on language from *Nebraska Press Association* indicating that the size of the jury pool was a crucial consideration. 427 U.S. at 563–65, 96 S.Ct. at 2804–06 (invalidating a pretrial order restraining the media from reporting facts detrimental to the defendant). Unlike *Nebraska Press Association*, *CBS*, and *Associated Press*, this case does not involve an order aimed solely at curbing *pretrial* publicity. Instead, the district court's order was aimed expressly at publicity during, or immediately before, trial. As the district court noted, this type of publicity has a greater potential for prejudice than publicity months in advance of trial. *See United States v. Coast of Maine Lobster Co.*, 538 F.2d 899, 902 (1st Cir.1976); *Chicago Council of Lawyers*, 522 F.2d at 253. Even if an impartial jury could be selected, intense prejudicial publicity during and immediately before trial could allow the jury to be swayed by extrajudicial influences. More importantly, the circus-like environment that surrounds highly publicized trials threatens the integrity of the judicial system. *See Sheppard*, 384 U.S. at 342–49, 86 S.Ct. at 1511–15 (describing the circus-like environment surrounding the Sheppard trial). Accordingly, the district court's conclusion that publicity posed a serious and imminent threat to the administration of justice was appropriate.

The petitioners also argue that the district court overstated the amount of publicity involved in the case. We disagree. While we have focused on the article in the *Los Angeles Times*, it is apparent that this case has received widespread publicity. The district court found that the level of publicity would increase as the trial approached. We conclude that the district court's findings in this regard were appropriate. *See Nebraska Press Association*, 427 U.S. at 562–63, 96 S.Ct. at 2804–05 ("Our review of the pretrial record persuades us that the trial judge was justified in concluding that there would be intense and pervasive pretrial publicity concerning this case. He could also reasonably conclude, based on common human experience, that publicity might impair the defendant's right to a fair trial.").

Finally, we must determine whether the extrajudicial statements by trial participants are the cause of prejudicial publicity. Both the Supreme Court and this court have recognized the effectiveness of restraining orders against trial participants. *Nebraska Press Association*, 427 U.S. at 564, 96 S.Ct. at 2805; *Farr*, 522 F.2d at 468–69; *cf.* Freedman & Starwood, *supra*, at 610–13 (arguing that the language in *Nebraska Press Association* should be viewed as dictum). Moreover, the district court found that extrajudicial statements by attorneys threatened to create extensive prejudicial publicity. Accordingly, we conclude that the district court properly found that its order would be effective.

In sum, we conclude that the record supports the district court's conclusion that the activity restrained poses a serious and imminent threat to the administration of justice.

## C. *The Narrowness of the Order*

The district court's order bars trial participants from making "any statements to members of the news media concerning any aspect of this case that bears upon the

merits to be resolved by the jury." While the order is not expressly limited to extrajudicial statements, the district court had noted that the attorneys could communicate their views to the media "through opening and closing statements, as well as through effective examination of witnesses." The petitioners contend that the order is both vague and overbroad.

We do not agree that the order is vague. A restraining order is unconstitutionally vague if it fails to give clear guidance regarding the types of speech for which an individual may be punished. *See Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974); J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 871–72 (2d ed. 1983). Applying that standard, we conclude that the order is not unconstitutionally vague. *Cf. Hirschkop,* 594 F.2d at 371 (holding that "other matters that are reasonably likely to interfere with a fair trial" is too vague).

We conclude, however, that the order is overbroad. It is apparent that many statements that bear "upon the merits to be resolved by the jury" present no danger to the administration of justice. *See Halkin,* 598 F.2d at 196–97 & n. 51. After the filing of this opinion, the district court must determine which types of extrajudicial statements pose a serious and imminent threat to the administration of justice in this case. The district court then must fashion an order specifying the proscribed types of statements. With regard to statements by the prosecution, it would be appropriate for the district court to order the government to observe the self-imposed limitations set forth in 28 C.F.R. § 50.2(b) (1984). With regard to statements by the defense, it would be appropriate to proscribe statements relating to one or more of the following subjects:

(1) The character, credibility, or reputation of a party;

(2) The identity of a witness or the expected testimony of a party or a witness;

(3) The contents of any pretrial confession, admission, or statement given by a defendant or that person's refusal or failure to make a statement;

(4) The identity or nature of physical evidence expected to be presented or the absence of such physical evidence;

(5) The strengths or weaknesses of the case of either party; and

(6) Any other information the lawyer knows or reasonably should know is likely to be inadmissible as evidence and would create a substantial risk of prejudice if disclosed.

*See also Model Rules of Professional Conduct,* Rule 3.6 (1983); *ABA Standards for Criminal Justice* Standard 8–1.1 (1982); *Model Code of Professional Responsibility* DR 7–107 (1979).

D. *The Availability of Less Restrictive Alternatives*

In its oral order, the district court considered and rejected several alternatives to a restraining order. The petitioners challenge the district court's findings regarding each alternative.

1. *Voir Dire*

In *Nebraska Press Association,* the Court suggested that "searching questioning of prosepctive jurors ... to screen out those with fixed opinions as to guilt or innocence" would be an appropriate alternative to a restraining order. 427 U.S. at 564, 96 S.Ct. at 2805. The district court rejected that alternative in this case:

Foir [sic] dire clearly does not provide an adequate alternative in the face of such prejudicial comments emanating from defense counsel. As observed by the Seventh Circuit, "Attorneys' statements are often the source of prejudicial publicity, especially since their views and comments are usually accepted by the public on the basis that they come from a wellspring of reliable information." [*Chicago Council of Lawyers,* 522 F.2d at 250.]

It is ironic that this court addresses this restraining order issue on the same day that it receives a suggested voir dire

questionnaire addressed to pretrial publicity. It is not in the parties' interest or in the interest of justice to exclude from the jury all citizens who read the Los Angeles Times or who otherwise keep abreast of current events.

Moreover, counsels' misinterpretation of their obligations indicates that such prejudicial extrajudicial comments will continue during trial and voir dire is powerless to neutralize such prejudicial publicity.

The petitioners argue that searching voir dire would eliminate any bias caused by pretrial publicity. While that may be true, we agree with the district court that voir dire cannot eliminate prejudice caused by publicity during the trial. Moreover, voir dire cannot alleviate the harm to the integrity of the judicial process caused by the extrajudicial statements of trial participants.

### 2. Instructions

In *Nebraska Press Association,* the Court also suggested "the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court." 427 U.S. at 564, 96 S.Ct. at 2805. The district court rejected this alternative:

> [E]mphatic and clear instructions are inadequate. Given no basis for counsels' statements other than inappropriate lobbying on their clients' behalf, this court should not run the ... serious and imminent risk that the reasonably anticipated barrage of prejudicial publicity will poison the impartiality of a jury, even with such limiting instructions.

The petitioners challenge the district court's finding solely on the ground that nothing in the record proves that the jurors would not abide by such instructions. We recognize, however, that jury instructions are often an ineffective remedy. *See, e.g., Silverthorne v. United States,* 400 F.2d 627, 643 (9th Cir.1968); Isaacson, *Fair Trial and Free Press: An Opportunity for Coexistence,* 29 Stan.L.Rev. 561, 566–67 (1977). The district court's finding that such instructions would be inadequate is

not baseless. Moreover, we note that jury instructions cannot address the threat to judicial integrity posed by prejudicial extrajudicial statements.

### 3. Change of Venue or Postponement

The *Nebraska Press Association* Court also suggested change of trial venue and postponement of the trial date as alternatives to a restraining order. 427 U.S. at 563–64, 96 S.Ct. at 2804–05. The district court rejected those alternatives because "[h]ere the problem is with curbing unwarranted statements by counsel, and a change of venue or postponement would simply have no effect on the problem." We agree. A change of venue would be appropriate if the publicity surrounding a trial is centered on a specific geographical location. A postponement would be appropriate if the publicity is temporary. This case presents neither situation.

### 4. Sequestation

The *Nebraska Press Association* Court noted that sequestration of jurors is always an alternative. 427 U.S. at 564, 96 S.Ct. at 2805. The district court rejected that alternative:

> [S]equestration is an undesirable alternative. Jurors, especially in long trials, should not bear the brunt of counsels' transgressions.
>
> Moreover, the resentments and ... harassment which derives from sequestration can often impede calm and rational deliberation. In this court's judgment, sequestration is a remedy clearly more drastic than the restraining order being issued today.

The negative effects of sequestration are well documented. *E.g.,* J. Van Dyke, *Jury Selection Procedures* 181–83 (1977). We conclude that the district court properly rejected this alternative.

### 5. Summary

■ The various alternatives to a restraining order would be either ineffective or counterproductive. A restraining order on trial participants, however, is a highly

effective remedy for excessive trial publicity. In *Sheppard,* the Court stated:

> Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate [the court's] function [in insuring a fair trial]. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

384 U.S. at 363, 86 S.Ct. at 1522. In *Farr,* we endorsed the remedy employed by the district court:

> In a criminal case the trial judge has a duty and obligation to attempt to protect the right of the defendants to a fair trial, free of adverse publicity. Where the case is a notorious one, that burden on the court is heavy. The most practical and recommended procedure to insure against dissemination of prejudicial information is the entry of an order directing that attorneys, court personnel, enforcement officers and witnesses refrain from releasing any information which might interfere with the right of the defendant to a fair trial.

522 F.2d at 468. We conclude that the district court's choice of remedy was appropriate.[3]

## V

## CONCLUSION

The petition for a writ of mandamus is granted. The district court is directed to define the scope of the restraining order in accordance with this opinion. This panel shall retain jurisdiction over any subsequent petitions for writs of mandamus arising out of the restraining order at issue in this case. The mandate shall issue forthwith.

It is so ordered.

---

**3.** We reject the petitioners' argument that the government has "unclean hands." *See Shep-*

SNEED, Circuit Judge, concurring:

I concur in Judge Beezer's opinion. I write separately only to express a slightly different approach to gag orders than that of Judge Beezer.

My starting point is that the conduct of lawyers should eliminate the necessity of imposing such orders. Respect for their profession and the integrity of the judicial process should be sufficient to deter the type of conduct that makes gag orders directed at lawyers necessary. Unfortunately, this required level of professional conduct sometimes does not exist. Bar associations appear to be incapable of securing it.

This requires, *inter alia,* confrontation with the tension between the interests served by the First and Sixth Amendments. Properly imposed gag orders do inhibit the flow of information available to the press even when not specifically directed at the press. On the other hand, it is presumed that such orders do tend to assure an impartial jury.

The difficulties attending the drafting and enforcing of proper gag orders, which in part this case illustrates, tempts one to consider the consequences of severely restricting or even eliminating their use. Juries time and time again surprise us with their ability and willingness to penetrate the confusion created by counsel, both within and without the courtroom, witnesses, the press, and, one must add, the very language and forms of the law itself. Their verdicts generally are fair. Thus, it can be argued that there is no need to shelter jurors from what the press reports about the statements of counsel before and during the trial. Some might go further and insist that jurors should be totally immersed in the community environment until discharged in order to reflect properly community values.

Any inclination to accept unqualifiedly these positions is checked by the Sixth Amendment's guarantee to an accused of

*pard,* 384 U.S. at 359 n. 13, 86 S.Ct. at 1520 n. 13.

an impartial jury. Prosecutorial freedom to communicate as it wishes with the press both before and during trial would make it very difficult in an emotional setting to assure the impartiality of a jury. At the very least we are sufficiently doubtful of that ability to be willing to unleash prosecutors completely. As a consequence, we applaud the rules imposed by the Department of Justice under which prosecutorial contacts with the press are governed. *See* 28 C.F.R. § 50.2 (1985). Were they not in place the courts would evolve similar restraints. First Amendment concerns would not prevent their development and use.

The Sixth Amendment's guarantee of an impartial jury, however, is an obligation of the nation, not the accused. It is not his duty to provide an impartial jury. Indeed, we recognize, at least implicitly, that an accused, within certain limits, can attempt to obtain a jury that is *partial* to him. Lawyers frequently describe what in essence is the search for a *partial* jury as only a quest for an *impartial* one. This sort of dissembling usually is relatively harmless. It becomes more troubling when the accused in his understandably zealous search for a partial jury insists that the Sixth Amendment, reinforced by the First Amendment, provides a protective immunity over a wide range of activities that have as their purpose the attainment of such a jury. Neither amendment, however, assures the accused a *partial* jury. He may attempt to obtain one, but he is not guaranteed one.

Courts, therefore, cannot escape the task of fixing the limits within which the accused legitimately may seek a jury partial to his interests. Intimidation, threats, and other forms of duress obviously are not immunized by either the First or the Sixth Amendment. Broadly speaking, the issue before us in this case is whether the "lobbying efforts" by the attorneys of those here accused of espionage as reflected by the record before us could transgress these limits. I am prepared to accept the conclusion that they could.

In reaching that conclusion, I must point out, as does Judge Beezer, that although the Sixth Amendment does not guarantee that the people of this nation will witness a fair trial before an impartial jury, the people *expect* such a trial. Moreover, the court should make a reasonable effort to provide precisely what the people expect. In doing so, it must not confuse that expectation with a public lust for a verdict of guilty.

Evenhanded treatment of the prosecutor and defense counsel no doubt tends to reinforce the public's perception that the trial is fair. Evenhandedness, however, is not required by the Sixth Amendment. Prosecutors may be subjected in gag orders to more stringent restraints than are defense counsel. The balance here is between the *right* of the accused to an impartial jury and the *expectation* of the people that the jury is impartial. If evenhandedness is to be put aside, it is the accused that must be favored. The ideal, of course, is a fair trial before an impartial jury. A properly limited gag order directed at prosecutors and defense counsel can be helpful in achieving this end.

Speech by those parties, to repeat, can destroy the impartiality of a jury and make a fair trial impossible. It happens infrequently, but it is possible. The result may favor the accused or the state. It is a result that cannot be avoided by muzzling the press in advance of the trial. *See C.B.S. v. United States District Court for the Central District of California,* 729 F.2d 1174 (9th Cir.1984); *Associated Press v. United States District Court for the Central District of California,* 705 F.2d 1143 (9th Cir.1983). Gag orders, such as here involved, present the issue whether the speech of attorneys can be restrained to reduce the risk of elimination by the press of the possibility of a fair trial before an impartial jury. The Supreme Court has told us that courts can restrain such speech. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell,* 384 U.S. 333, 358–62, 86 S.Ct. 1507, 1519–22, 16 L.Ed.2d 600 (1966). The restraint,

however, must be precisely drawn. Judge Beezer clearly has indicated how this should be accomplished.

The balance that should be struck is between First Amendment rights, the Sixth Amendment rights of the accused, and the public's expectation that the trial will be fair and before an impartial jury. This sort of delicate balancing should be undertaken reluctantly; but when provoked by attorneys, whether prosecutors or defenders, who seek by use of the press to obtain as partial a jury as possible, courts must respond.

NELSON, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I, II, III, and IVA of Judge Beezer's opinion, and agree that the writ of mandamus should be granted. Also, like Judge Sneed, I find much to agree with in the remainder of the opinion. I cannot fully concur, however, because I do not believe that the record reflects an adequate showing of a "clear and present danger or a serious and imminent threat" to the empaneling of an impartial jury in this case. *See United States v. Sherman,* 581 F.2d 1358, 1361 (9th Cir.1978). Thus, the district court's order does not meet the first prong of the test articulated in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), which is set forth in Judge Beezer's opinion. *See CBS, Inc. v. United States District Court,* 729 F.2d 1174, 1178–82 (9th Cir.1984). For this reason I cannot on this record subscribe to Judge Beezer's apparent approval of a revised form of prior restraint order.

As we all recognize, this case involves striking a delicate balance between rights guaranteed by the First and Sixth Amendments. Prior precedents tell us, however, that these rights are not to be weighed equally when a prior restraint is involved. Prior restraints on free speech are subject to strict scrutiny and may be upheld, if at all, only in extraordinary circumstances. *See CBS,* 729 F.2d at 1183. There is a "heavy presumption against [the] constitutional validity" of a prior restraint. *Orga-*

*nization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971). Thus, it is not enough for a court to decide that the fair trial right may be affected by the exercise of free speech. Nor is it enough for us to conclude, as we could here, that the prior restraint has a rational basis.

Instead, we must apply an "enormously exacting" standard. *CBS,* 729 F.2d at 1178. As we said in *CBS,*

> Only if it is "clear ... that further publicity, unchecked, would so distort the views of potential jurors that 12 c[an] not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court" can an appellate court even consider upholding a prior restraint.

*Id.* (quoting *Nebraska Press,* 427 U.S. at 569, 96 S.Ct. at 2807).

The district court's focus, then, should be on the impact of the pretrial publicity rather than its source. The court should consider the possibility that pretrial publicity may prejudice the "entire community." *CBS,* 729 F.2d at 1180. In the context of this case, this possibility will probably be remote. As we noted in *CBS,* "the courts have long held that in a large metropolitan area, prejudicial publicity is less likely to endanger" the right to a fair trial. *Id.* at 1181. With a population of about 12 million in the Central District of California, it should be possible to find an adequate number of unbiased jurors even in the face of the most pervasive publicity. *See id.* at 1181–82. Indeed, in *Nebraska Press* the Court suggested that a pool of 80,000 prospective jurors might be sufficiently large to protect against prejudicial publicity. *Nebraska Press,* 427 U.S. 539, 563 n. 7, 96 S.Ct. 2791, 2805 n. 7, 49 L.Ed.2d 683 (cited in *CBS,* 729 F.2d at 1182). In short, the record before us does not, in my opinion, support adequately the issuance of the district court's order.

I do not mean to suggest that an order restricting attorneys' statements to the press will never be permissible in this par-

ticular case. Once the jury is empaneled, the district court will be faced with a different situation. Even then, however, the court must examine closely the alternatives to issuance of an order restricting speech. The viability of jury sequestration, curative jury instructions, and other potential remedies must be re-examined in light of the degree and nature of publicity at that time. The court should also examine whether any proposed order will be effective in curbing prejudicial publicity. *Cf. Associated Press v. United States District Court*, 705 F.2d 1143, 1146 (9th Cir.1983) (in striking down court-ordered sealing of documents, appellate court found that there was not "a substantial probability that closure will be effective in protecting against the perceived harm," citing *United States v. Brooklier*, 685 F.2d 1162, 1167 (9th Cir.1982)). Publicity in this case is likely to be widespread even if the district court restricts attorneys' comments to the press. The court should consider seriously whether the benefits to the Sixth Amendment will outweigh the costs to the First before resorting to a prior restraint on speech.

I sympathize with Judge Kenyon's concerns about the professional duty of lawyers to refrain from engaging in publicity campaigns which may tend to threaten the orderly administration of justice. One would hope that rules governing such conduct would emanate first from the bar, lessening or eliminating the need for courts to consider imposing prior restraints on speech. The enforcement of relevant rules of professional conduct would of course be after-the-fact remedies, admittedly less effective but far safer than prior restraints. Concern over the professional ethics of those who would try their cases in the press, however, should not replace dispassionate analysis when First Amendment freedoms are in the balance.

In summary, I agree with my colleagues that the writ should be granted. On this record I do not believe that a prior restraint can be justified by the requisite "clear and present danger" or "serious and imminent threat" to Sixth Amendment rights.